L1658 INTELLECT WIRELESS v. HTC Good morning, Your Honor. The issue here is why. Why would Henderson have filed, have specific, the issue here is why. Why, if Henderson had specific intent to deceive the Patent Office into allowing his application based on actual reduction of practice, would he correct his declaration to remove reliance on actual reduction to practice? The examiner based the allowance on constructive reduction to practice. Thus, statements about actual reduction to practice are not but for material. In addition, because Henderson took actions to correct any statements on actual reduction to practice, specific intent to deceive the examiner is not the single most reasonable inference. In fact, multiple reasonable inferences can be drawn, one of which is that Henderson filed the corrected declaration to assure that the examiner relied on constructive reduction to practice. Counsel, Roman Haas, written by Judge Rich, seems to come pretty darn close to this case on its legal standard, namely curing a defect. And Judge Rich explains that in order to cure, you have to take necessary action of your own initiative and take it openly. It does not suffice that one knowing of misrepresentations in an application or in its prosecution merely supplies the examiner with accurate facts without calling his attention to the untrue or misleading assertion. So where in this record is it demonstrated that your client or his attorney told the examiner that the statements about actual reduction to practice and a prototype to the Smithsonian and a demonstration were false? Where does he mimic that? Because Judge Rich says it's not enough to put in new facts. You have to tell the examiner expressly what was wrong with the old facts. So exactly where can I find that? First of all, we would dispute that the Smithsonian information is false and the applicant did tell the examiner Are you saying there's nothing false in the first 131 affidavit that was filed? No, Your Honor. It's not that it was false. It was misunderstood. And you can understand how he would misunderstand. Misunderstood by whom? By the inventor, Your Honor. And as soon as he knew he misunderstood it, he called in. I don't understand how he could misunderstand. He claimed that he demonstrated a working prototype of the invention. But he didn't demonstrate a working prototype of the invention, did he, Miss Abbey? Your Honor, he demonstrated a prototype of a prior invention that didn't have picture claims. And the claims at issue in these patents are picture claims. The prior invention that he's talking about... The claimed invention was actually reduced to practice and was demonstrated at a meeting with Hashimoto. Understood. And that's where he made his mistake. And when he realized, if you look at the red brief facing page 7, you can see how complicated this prosecution history was. There were many pending applications claiming different inventions at the same time. When he recognized his mistake, he called his examiner. The very next business day, the examiner called... I mean, the patent attorney called the examiner and told the examiner that there were problems with the declaration and actual reduction of practice. But that's the problem. He didn't tell the examiner there were problems with actual reduction of practice. There's nothing in the evidence that I can find that suggests that. He says instead, we're submitting a revised declaration and would like you to rely on constructive reduction of practice. But that's the problem. That's not enough under Roman Haas. Roman Haas says it's not enough to supply new correct facts. You have to openly inform the examiner of the falsity of the facts you originally put forth. And that's what's missing from this record. So if that's present in this record, show me where it is. Your Honor, it's present in the phone call which he testified to. However... Show me... His testimony does not say that... Speaking with the examiner, I told him do not rely on actual reduction of practice because we didn't actually reduce to practice. That statement was false. I see none of that in any evidence related to the phone call. So show me exactly where it is. Your Honor, looking at Roman Haas... No, show me where the evidence is. You said it's present in the phone call. I said he said in the phone call that they were uncomfortable with actual reduction of practice and they needed to go with constructive reduction of practice. Well, uncomfortable with actual reduction of practice, A, I don't see where he said that in the phone call or where there's any evidence that he said that. But B, that's not the same thing as saying when we said we reduced it to practice and demonstrated it, that didn't actually happen. Your Honor, even taking your facts, that doesn't satisfy the Feruson's requirements, the two separate materiality and intent requirements for inequitable conduct. Number one, he did file a revised declaration. And whether or not Roman Haas applies to procedurally, properly correct it isn't the issue here. The issue here is whether he has good intent to correct it. Okay, so you're going to step away from materiality and focus exclusively on intent? I'd like to focus on both during my time up here, Your Honor. Well, I guess I haven't heard any responses to materiality, though. We know from materiality that the examiner relied on constructive reduction of practice. But we don't need to find but-for materiality if we have a false affidavit. Isn't that right? I mean, isn't that what Feruson says? It does, Your Honor, but Feruson also says that this exception to materiality is reserved for extraordinary circumstances of affirmative misconduct. And here, even if you find- Such as false statements, false affidavits. And even if you find that the February 9th affidavit was false, you have to consider the steps taken both by Henderson and his attorney to correct those false statements. But the affidavits then, okay, that you're going back to intent now. So materiality, they're false statements. The new affidavit he puts in continues to contain false statements. Now, you've tried to argue, well, that was a mistake. But again, that goes to intent. On materiality, you've got per se materiality because you have a false affidavit filed in the PTO. Period. We can move on to intent. The February 9th, if you say there was a false affidavit, we can move past that. The February 12th affidavit- Continues to be false. There continue to be false statements in that affidavit, are there not? There are not false statements in the February 12th affidavit. Doesn't it say actual deduction of practice? That is a remnant, Your Honor. No, is it a false statement? Did he or did he not actually reduce to practice? He did not actually reduce to practice. So to the extent that it says the words actual reduction of practice, those statements are false. They may be mistaken and not intentionally present, but they're still false nonetheless, correct? They are mistakenly incorrect. But are they false or are they true? They're false under your definition. True and false is a binary thing, Sadie. Either he reduced to practice actually or he didn't. He admits, and he admitted on the February 12th that he was relying on constructive reduction to practice. It's in paragraph 4 of the declaration that he's relying on constructive reduction to practice. He took out all the facts supporting actual reduction to practice. There's no date to support actual reduction to practice, and there are no appendices to support actual reduction to practice. But the words diligence is shown from the conception date to the date of actual reduction to practice. There was month-to-month activity in support of bringing the claimed subject matter to commercialization. Neither reduction to practice nor commercialization ever occurred, correct? No, it did not occur. But that language remained in the affidavit, did it not? You can call it a remnant or not, but it's still false, right? It's false. But the statement is not material because the examiner relied on constructive reduction to practice at the time. Okay, I think you need to move on to intent. Okay, Your Honor. On intent, you have a specific—on intent, Your Honor, the court used the general intent standard. The court said the evidence strongly supports the existence of an intent to deceive, and that's with A45. But if you unpack what the court found, you'll see that the court failed to consider the facts that surround the filing of the February 12th declaration, the facts that I just went through relating to paragraph 4, which states it's relying on constructive reduction to practice, that they removed all of the supporting facts and documentation, and that there's no date. In addition, we know because the examiner says that he relied both on the February 12th declaration, and he says in every notice of allowance either the February 12th or he relied on Appendix B. And Appendix B is a conception document. If he were relying on constructive reduction to practice, he would have had to rely on— Well, what about the press release that's been sent over after that point in time? So didn't the court rely on the fact that not only did language relating to reduction to practice remain, but then some months later, a press release is sent over discussing a reduction to practice? First of all, if you look at the press release, it doesn't discuss a reduction to practice. It talks about the materials and supporting documentation and the prototype that was sent to the Smithsonian. It doesn't say that there was commercialization or reduction to practice. It says prototypes of picture phones, right? And that doesn't mean that it was a reduction to practice. It's a prototype. It doesn't explain. But in addition— Wait, it's a prototype. What is a prototype but for a working model of the invention? I don't understand what else a prototype is. If I hold up a photograph, this is not in fact a prototype. A prototype is by definition a working model of the invention. I don't understand. I don't think a prototype has to be a working model of the invention. But in any event, the Smithsonian information or the press release came after the patents were issued. So it's not material and it doesn't have to do with specific intent to deceive the patent office into issuing the patent based on actual reduction to practice. When it comes to intent, which is just about the most quintessential factual determination that a court, prior fact, makes, don't we have to defer to the district court's determination? I mean, this wasn't summary judgment. This was after a trial. You do, Your Honor, except the district court didn't look at specific intent. The district court stated the right standard in the beginning of the decision, but then the district court applied a more general intent. He said evidence strongly supports the existence of an intent to deceive, and he used evidence that doesn't go towards the issuance of the patent under actual reduction to practice to support that intent to deceive. And so that's not the specific intent to deceive that Theracent requires under its strict rubric. I see I'm into my rebuttal time. Yes, why don't we hear from the other side. Thank you. Help me with your name here. Steven Korninski, Your Honor, and this is Martin Bader, my partner. Good morning, Your Honors. May it please the court. First, let me try to unwind a couple of these facts. First off, the prototype, regardless of which declaration we're referring to, the testimony of Mr. Henderson was, number one, it did not wirelessly transmit a picture, it did not wirelessly transmit an image, and it did not wirelessly transmit caller ID, which were the earlier declarations. Secondly, he also testified that prototype was explored extensively. What is a prototype? And he testified that he was distinguishing between a prototype, which is an actual model of the claimed invention, versus he had mock-ups. So he had also submitted these hollow plastic boxes where he had pasted his picture on it and submitted those with his prototype. And so we went into what is a prototype. So with regard to Judge Moore's question, it is an actual working invention of the model of the claimed invention. The other issue is- And does he continue to refer to prototypes in the second declaration? Yes. The second declaration where he is supposedly curing the false statement of actual reduction of practice, does he continue to refer to the existence of prototypes in that second declaration? Yes, Your Honor. In fact, Judge Hart addressed this, I think, in paragraph 27 of his order where he says, number one, he still refers to the actual reduction of practice in paragraph 11 of the second declaration. He refers to diligence where, based on the existence of the intellect prototype in the Smithsonian, that was in development in the Hashimoto demonstration. And in that particular paragraph 9-U, it also still includes the July 1993 date. It also- Why does the press release matter if it was after the patent for issue? Why does the press release matter? Well, for one thing, Your Honor, it was to the same examiner. But number two, it goes to credibility, and what did the inventor mean when he was referring to the second declaration? The focus is on the February 12th declaration. According to appellant, he had made a mistake and he was trying to correct it, and he didn't want to mislead the examiner, presumably. Yet, after submitting the second declaration and others, he then submits the press release with the same false statements that he said he was removing from the second declaration. So you're not arguing that the declaration has anything to do with whether the patent would have issued or not. You're arguing that the declaration is evidence of whether he did intend to deceive, and it was fair for the district court to consider that evidence. I am arguing that it definitely goes to specific intent, because there's a pattern of activities that occur, the press release sort of supporting what was said before. But first off, there's no rebuttal that there were false statements in the February 9th declaration. I don't think they address anything. The only thing they say is it was a mistake. The only possible mistake they referred to in their reply brief is that they failed to include the appendices to the February 9th declaration. The examiner then issues a notice of allowance based specifically on that first declaration. So the claims were allowed based on that first declaration, and we believe inequitable conduct is established based on that. However, appellant then argues somehow that that declaration doesn't count because the examiner only relied on the second declaration in February 12th. But in order to rely on that argument, they mischaracterized the record. And they state in footnote 2 that the declaration had been faxed, the second declaration had been faxed to the examiner before he issued the first notice of allowance. In fact, that's not true. There were two witnesses that testified at trial, Mr. Henderson himself at A5375-76, and he testified that the number at the top of that fax, it says sent from. That's a Dallas-Fort Worth number. That's not a Virginia number. That was Mr. Henderson sending the declaration to his attorney. And the other witness who testified to that was Mr. Carmichael, who was a patent office practice expert, and he testified to the same at appendix 5203-04. On curing the inequitable conduct, because I think this goes to intent, Ms. Addy has argued that why would he have submitted the second declaration if he wasn't trying to cure, and doesn't that undermine a showing that the only reasonable inference that can be drawn is intent? What would you say in response to that? Wow, that's a loaded question. There are probably three different responses we can make here. Number one, let's look at what Judge Hart found. Judge Hart found that that declaration was submitted in order to mislead and deceive the examiner. The second one. The second one, correct. Can you go over with me all the things about the second declaration that you believe are misleading? Would you mind walking me through them? It's in the record. It's 77, 44, and 45. Correct. I think that paragraph 11, where he refers specifically to actual reduction in practice, there's nothing in that declaration, by the way, that ever says we made a mistake. There's nothing that says we were only relying on constructive reduction in practice. In fact, if you look at the transmittal documents, it says this is a supplemental amendment. Well, the transmittal documents also say revised. Well, it also says it's an additional declaration. What I want you to focus on is the language in the Rule 131 that you think, in addition to the words actual reduction in practice, are implying or misleading into a belief that there continues to be some sort of prototype or something. Okay, so I refer to paragraph 11, which explicitly refers to the actual reduction in practice. Within the diligence evidence, do you think some of that? Yes, paragraph 9-U, he claims diligence based on the existence of the intellect prototype in the Smithsonian that was in development for the Hashimoto demonstration. I believe the date is on the side there. Now, keep in mind, the day before, the examiner had reviewed the first declaration, which says— He said he demonstrated an actual reduction of practice at the Hashimoto demonstration. Exactly. And so you think this doesn't cure it. It continues the same— It continues it, exactly. It doesn't say, to clarify, when he demonstrated Hashimoto beforehand, it was a simulation or it was on paper. It wasn't an actual working model. That's exactly right. And that's what you think would have been necessary. In failing to do that, you're continuing to mislead. Correct, because how would a typical person read it? Unless you said, eliminate, forget what I said yesterday because it's just a few days earlier, he's going to refer back to, oh, yeah, I already read that. Secondly, that diligence argument, just to explain what was going on there, Mr. Henderson had to establish a one-year diligence period, the shortest period of time, in order to overcome the Albert reference. There was about a five- to six-week period of time when nothing had happened. The only thing he had to fill in that five- to six-week period of time was the Hashimoto demonstration. So if you take that out, all of a sudden he has a lot of trouble. In fact, the unrebutted testimony of trial is he couldn't overcome diligence or he couldn't satisfy diligence. So he couldn't take out his reduction to practice completely, or he would fall on that point even if he otherwise could rely on construction. That's correct, Your Honor. There was more, just to finish, Your Honor, as a question. Paragraph 9GG, he refers to the pictures of the intellect product, and he says it's a brochure and packing receipt of the intellect product. That implies the existence of the product. Exactly, and it implies that he's commercializing it. In fact, when you look at the receipt, it wasn't a receipt of the intellect product. It was a receipt for brochures. So it's totally misleading and mischaracterizes what was actually the document being relied on. And then when you read the next paragraph, 12, it asserts a month-to-month activity in support of bringing the subject matter to commercialization. Now, I understand your argument. I'm sorry, I didn't mean to cut you off, but I understand your argument is that each of these statements is themselves a false statement. But Ms. Addy points out in her brief that bringing subject matter to commercialization, he doesn't say was commercialized, and it's sort of cute with the language, the same thing with you. Product view and feature chart shows prototypes now in the Smithsonian that was developed for Hashimoto demonstration. Is your argument that these are patently false or that these statements are misleading and in light of the prior declaration show a continued intent to deceive? I think it's more accurate if I take away my adversarial approach. I think it's more accurate to say it was misleading and it continued the mischaracterizations of the first declaration. But I still believe when you read it, when I read it, and we were going through discovery, we're trying to find out when was it offered for sale, how was it commercialized. I mean, those are the questions that were being asked because you're reading about this receipt, a packing receipt and brochure of the entire product. It makes it sound like there's an actual product tied together commercially. There's one additional one that I was baffled by, but I admit I don't know, if I know the record well enough, whether this was raised by the court expressly. But in that second declaration, Appendix C, if you look on page 2 of the declaration, it says the date is February 1993. And it says radio frequency device programmable by a PC using data. Well, when you actually turn to Appendix C, it's a picture of, I assume, Mr. Henderson himself surrounded by all of the devices. And below it, it says received in the permanent collection of the Smithsonian Institution. But these devices were not received in 1993, were they? I don't believe they were, Your Honor. I mean, I guess I'm wondering if this is sort of the same. I don't know if you know which picture I'm talking about. I do, I do. And I'm trying to recall because- 2007, I think. See, I think part of the reason that the second declaration may have been filed was to reorder the exhibits. I guess what I'm wondering is how does this Exhibit C, Appendix C, actually support within their diligence analysis a date of February 1993? I don't think it does, Your Honor. I guess I'm wondering if it's a part of the whole- It is, Your Honor. In fact, one of the things I guess we didn't do for the appeal is go through each of the exhibits attached to that appendix in order to establish diligence. We did at trial. And when you go through each one of those, there's something wrong with virtually all of them in terms of how it's described, is there evidence of a date, how do we know that's the date, and so on and so forth. So that was just one of the issues, I guess. Can I turn to materiality for a second? It's confusing because both you and the district court, at least at some point, refer to the concept of the per se materiality that arises from a false affidavit to the PTO. But then the district court went on to find materiality, and you make a lot of arguments about the timing of the initial allowance, which would imply that you are intending to focus on whether or not it's but-for material. Is it necessary to address but-for materiality when there is per se materiality? I don't think it was necessary, but the argument that we had to address was this interpretation of Theracense that mistakenly false means you couldn't have made a false statement by mistake. So the argument that Appellant was making is we made a mistake by making a false statement. At least that's the way we interpreted it. So when we argued the issue, we argued both, that there was per se materiality and there was also but-for materiality. Because the district court didn't rely on per se materiality, can you argue per se materiality here, or could we rely on per se materiality in the absence of that express finding below? I'm not sure the court did not rely on per se materiality because when the court goes through the statement of the law and cites the Theracense, he specifically says, in this case, this is what we would have to show. He also states in his findings of fact that the statements were in fact false, that the inventor, Mr. Henderson, knew what his prototype was capable of doing, he knew what happened at the demonstration, and he knew his statements were false. So I think the facts are there to establish per se materiality, but I think the district court also covered himself because in fact the declarations were necessary. But he didn't actually say he was applying the exception, did he? He didn't come out expressly and say that, no, Your Honor. Okay. Out of curiosity, this seems like a big patent family. Only two patents of that family are at issue in this case, right? Correct. But the same declaration that we're talking about as the second Rule 31 affidavit was also filed 11 times in these patents and then in nine others that are not at issue in this lawsuit. Correct, Your Honor. In fact, that goes to everything from why the second declaration wasn't a mistake. It goes to specific intent. It goes to the single most reasonable inference. If you look at what happened in this case, Judge Hart considered all of these issues on a motion for summary judgment. He then had the argument where he said, look, I'm going to deny the motion, but I want you to focus on two issues at the trial. Focus on the interrelationship of the patent applications and declarations and also on intent. Okay, so then we had a four-day trial and we addressed all of these. Just out of curiosity, did any of the subsequent patent applications, some of which I think I understand to have been in prosecution even after you all have raised these allegations of inequitable conduct, was there any clear curing in those applications of these infirmities? No, Your Honor. In fact, so just going through to address your first question, because I digress, number one, you had the February 9th and the February 12th declarations, which we say were false or contained false statements. Prior to that, there were three other declarations which were directed towards this pager, and during the trial it came out that even those declarations weren't supported, and those declarations were filed in order to get over the Richardson and Wolf prior part references. So the court found that those also weren't supported. Okay, so that was the first time he submitted false declarations. We then get to the February 9th, February 12th, and then the related applications, I think there were seven or eight after that where he made the same false statements that were in the February 12th declaration. And I think what the court found there was it's incomprehensible that the inventor and the lawyer, patent lawyer, would miss them so many times if, in fact, they were trying to cure the mistake in the February 12th. In other words, if you're trying to cure a mistake, what you're going to do is be very careful in terms of reading that second declaration, and then the 7th, 8th, 9th, 10th, 11th, 12th, and 14th. So then after that, you get to the press release. And in the press release, they're still telling the same examiner that we have this intellect prototype of a picture phone, but he knows he never, ever, ever made a picture phone. Then we get to the lawsuits. He filed five complaints against the virtually entire cell phone industry, including some of the service providers like Verizon. And in the complaints, he said the same thing. He has these prototypes of a picture phone. Totally false, and he knew it. Then in discovery, we sent out one interrogatory request. Tell us when the actual reduction of practice took place. He said there weren't any, and then he verified that. And then he changed his answer three times. Well, he changed his answer three times in terms of trying to explain the actual prototype. First he said there was none. Then he said there might have been one. And then he says, I think I was referring to the 862 patent, which is what counsel was referring to before as a mistake. But when you go to the 862 patent and you look at what his testimony was in the declaration, he said, I'm referring to paragraph or claim 46. That's what I thought was the image. But there's no reference to the image in that patent. The patent had already issued years before when he filed his false declaration. And in fact, there were only six claims. So he couldn't be referring to the claim 46 when there are only six claims in the 862 patent. And then when we tried to— I thought you've exceeded your time. Your Honor, thank you. Thank you. Ms. Addy, since your friend on the other side got an extra three minutes of time, we'll add that to your time if you need it. Thank you, Your Honor. A couple of points based on what my opponent said. First of all, there was subsequent conduct during prosecution to further correct the problem. For example, there was a teleconference on November 21, 2011, and that's at— Wait, to correct the problem? That's way after the patent issue. But one of your questions was, did they have subsequent conduct to correct it? How can you correct the examiner's understanding during prosecution after the patent has issued? They were trying to ensure that the examiner had relied on constructive reduction to practice. And so they asked the examiner, did you? And he said, yes, I did. For all of the declarations, I relied on constructive reduction to practice. And that's in the interview summary record at 26-151. The examiner said that. And so rather than cure something, it's more saying, this is what happened all along, confirming that the examiner didn't rely on actual reduction of practice. But even if you asked the examiner to rely on constructive reduction of practice for one purpose, isn't it true that you still needed that demonstration, which your earlier affidavit described as a full reduction of practice, in order to establish diligence? No, Your Honor. If you look at our timeline facing page 17 of our blue brief, there's a multitude of other things that were going on towards reduction of practice, working towards commercialization that would count towards diligence. So we would disagree that you need that demonstration at all. In addition, Your Honor, there's no reliance in the district court decision on per se materiality. He says it, but he doesn't apply it. Instead, he finds materiality, but he doesn't use the but-for standard. We will admit the prosecutions here are not clean. They definitely are not clean. But when you look at all the circumstances, there was a lot going on. They were complex. There were multiple 131 affidavits getting filed within a week of each other. There was quick timing. And so based on all this and based on both the removal of the facts in the declaration and the date supporting actual reduction of practice and the specific statement in the paragraph 4 of the revised declaration that they're relying on constructive reduction of practice, there are multiple inferences that can be drawn, and one of them is that they were trying to correct the record, albeit didn't do it as cleanly as they could have. Thank you. Thank you. Thank both counsel. The case is submitted.